Our next case is William Smith v. Department of Labor. Mr. Zuckerman, nice to have you here sir. Thank you for having me. May it please the court, your honor. My name is Jason Zuckerman and I represent William Smith. We ask that this court reverse the ARB's ruling for two reasons. One, if the ARB's ruling were to be affirmed it would create a massive loophole in a law that is designed to provide robust protection to employees who blow the whistle at nuclear power plants. As a matter of public policy, we want to ensure that employees will blow the whistle where there's a hazard at a plant or there's a violation of an NRC rule. Under the ARB's ruling, if an employee becomes aware of an issue that the employee believes might be a violation, if the employee reports too early, the law will not provide any protection because the employee will not have had an objectively reasonable belief. If the employee then were to look into the issue, get more evidence of it and say, hey, this is a violation that I should report. At that point, if the employee were to report that issue under this holding by the ARB, that employee is out because if there is any delay at all, when the employee makes a report no matter how unimportant that issue is here, one minor inaccuracy in a log, nothing at all that was important. It's important in the context of nuclear regulation, though, isn't it? I mean, that's why you have fire watch logs. You want to make sure that there aren't fires that go unnoticed and take off and become... I have a three-part response to that, Your Honor. Why? Well, I'm not arguing the point. It's just that it seems to me that arguing the extreme position really doesn't help here because this is a serious issue, and then the question is really what protections was he entitled to and how the events played out, it seems to me. Your Honor, I would agree with that exactly. Here's what the issue is. If my client became aware that there was an inaccuracy in the log, what did he do? He goes immediately, as required by plant policy, and that's all he was required to do, to the individual who put the inaccurate information in the log and says, this is inaccurate, and that individual said he would correct that log. And the interveners have been clear that that's the main issue, Your Honor. Was that inspection actually performed? And my client immediately was concerned about that issue, and he learned that that inspection had been performed, and he met his obligation to go to the individual who put that information in the log and said, you need to correct that log. Pence wasn't his supervisor, right? Correct. But the interveners have acknowledged that... And here's why. Because the interveners have acknowledged that that's all my client was responsible to do. That's all he has to do. He has to go to the person who put that information in the log and says, you need to correct that log. That's his only obligation here. If my client had been on an inspection and saw smoke, and he didn't say anything about it, he didn't do anything about it, that would be a real problem. If there was some clear hazard here. I would say also, Your Honor, if the individual who put the inaccurate information in that log, and here that is Ms. Borders, if she blew the whistle on her own violation, she went to the employer and said, by the way, one week ago I knowingly put this inaccurate information in the log. I left early, but I claim that I performed that inspection. The law would not provide any protection to her. But the issue, Your Honor, is what would have been a proportional response here. And that response is not to remove an employee who had a flawless performance record. What would happen if the A or B's opinion were to be affirmed is that this court would alter the plain meaning of the statute and the A or B's prior holdings, and here's how. The statute requires, once my client has met his burden, which he did, he has to show that what he blew the whistle on had any impact at all on that adverse action. Once he does that, under the statute, the interveners have to show by clear and convincing evidence that they would have, not that they could have, but that they would have terminated his employment had he not blown the whistle under the A or B's holding in the Spiegel case. And in Spiegel, what the A or B does is it says to ALJs, here's how you. And they didn't apply Spiegel or they misapplied Spiegel? They misapplied Spiegel. They misapplied. Yes, Your Honor. But they knew about it, didn't they? At the time the A or B ruled in this case, yes. Well, sorry. When the ALJ ruled, he didn't know about Spiegel because it hadn't been issued. When the A or B ruled, they were aware of Spiegel, but I think it's pretty clear that they did not apply it as outlined in that holding. What happens? So what do you want us to do, send it back and tell them to apply Spiegel correctly? We would ask that the court reverse. If you look at the – I heard you say the reverse, but what do you mean by reverse? You don't want us to send it back and have them apply Spiegel? Yes, sorry, sorry, sorry. You want us to say that he didn't do anything wrong? No. We want us to – we would ask that the court adopt the ruling of A or B member Judge Joanne Royce. Excuse me. Judge Royce, one of the A or B members, went through the holding in the Spiegel case in a lot of detail, yes. And she applies – You want us to say she was right. Yes, yes. She applies Spiegel, and she looks at this record and says, as I am arguing here now, that if the court applies Spiegel to this evidence, the intervenors cannot meet that elevated burden. And I would like to walk through, if I could, why the intervenors are not able to meet that elevated burden. If you could address, please, the timing of the disclosure, because it seems to me that the timing is probably one of the most significant aspects of the case, that Mr. Smith did not report to management until after he had been accused of sexual harassment, and that four shifts had elapsed. And I know that part of your answer would probably be that he was counting on Mr. Pence to do the right thing and to make the adjustments in the law, but still you have a situation where you have this intervening act with the allegation of sexual harassment, and then it's only after that that you go to management. So if you could make that part of your analysis. Certainly. I certainly will, Your Honor. So what happens is that the intervenors have acknowledged unequivocally that all that my client had to do was go to Mr. Pence and ask that the law be corrected, and that's exactly what he did. Just a few days. You say that's all he had to do? All he had to do was go to Pence and tell him to fix it? Yeah, that's not me. That's what the intervenors. You don't have to report it to a co-worker? Yes. You don't have to report it to your supervisor? Sorry. Yes, that's what's in here, and I could read that out of the record. But, sorry, there is one other thing he has to do, which is exactly what he did. He has to ensure that the actual inspection was performed, and that's exactly what he did. Did he ensure that it was performed? Yes. The moment my client. Somebody told him it was going to be performed. No, no, sorry. Sorry, Your Honor. The moment my client got to work that day, he saw that there was inaccurate information. That the book had already been filled out. Yes. So he immediately went. And that time reflected there, but it hadn't gotten there yet. That was sometime prior or later or something. Exactly. And a very. It had already been falsified. The book had been. Correct. He found that the book was over in the coal mines in West Virginia. They called them fireball books. They called them something else. Correct. But he found that the book was falsified. Correct, Your Honor. And he told not the person that falsified it, but the other fellow. No, no. What he was required to do and what he did, and a very high-level plant manager named Mr. O'Brien. Acknowledged at the hearing, under oath, Mr. Smith did exactly what he was required to do. And what they would expect him to do, which is this. He immediately went to Mr. Pence, the individual who performed that inspection. And said, did you perform that inspection? And Mr. Pence confirmed that it was performed. That's the real issue here. Was that inspection performed? After that. But the name in the book was somebody else. It wasn't Pence. Correct. It was Ms. Borders. Ms. Borders. And Pence's name didn't show up in the book on that time. Correct. But the interveners. This isn't me. So the book was falsified. Correct. Or Pence was lying. Correct. It's one of those two things. Correct. Maybe both. But the interveners have acknowledged, and they're stuck with this, that all that my client had to do was to go to Mr. Pence and ask that he correct that log. And that's what he did. Now, to answer your question, Judge Kenan, they've argued, well, Mr. Smith is not an honest individual because he would not have made this report absent this allegation by Ms. Borders that she had harassed him. There are a few problems with that. When Mr. Smith was interviewed, he said that this log is handed in at the end of the month. He was planning to report it by the end of the month. And he said he was planning to report it because he had learned from one of his coworkers that Ms. Borders was angry at him for having spotted that error and that she was planning to make this untrue accusation. But here's what the problem is. Mr. Smith is interviewed by DZ Atlantic about this allegation of harassment. And he brings up that he's aware that Ms. Borders put inaccurate information in the log. What happens after that? And that's what's key. DZ Atlantic HR Manager, Ellen Simmons, ordered Mr. Smith not to report the issue to plant management. What did Mr. Smith do? Even though he knew he could lose his job, he goes all the way to plant management immediately, no delay whatsoever, and he reports the issue. What happens then? Plant management goes to DZ Atlantic Manager, Mike Henline. What does Mike Henline do? He doesn't interview my client. He decides without interviewing my client that my client is out. Why? Because he blew the whistle and he did not comply with the order by DZ Atlantic to hide this information. Now if the rule is, as the interviewers claim, that if you became aware that any employee has put inaccurate information in the log, you must report it immediately. Why didn't DZ Atlantic take any action against the HR Manager who told my client to hide that information from plant management? There are a few other aspects of DZ Atlantic's reaction to my client blowing the whistle that are highly problematic here. They say my client's not honest, but there's no evidence my client ever made any inaccurate statement whatsoever. And what happens here is they look at my client's motive for why he blew the whistle. That's a real problem. At a plant like this, they should be open to any employee blowing the whistle for any reason. How many people got fired? Three, Your Honor, and that's a really important point here. What the ALJ held is that, well, the plant got rid of these two employees, Ms. Borders and Mr. Pence, who were involved in placing inaccurate information logs, and that's exactly what my client did. No, it's not the same. My client blew the whistle on it, not once, but two times. He showed himself to be a reliable employee and had a flawless performance record. So he turned them both in. Yes. And they got fired. And he got fired. And then he got fired. Without, by the way, Your Honor, even being interviewed, because Mr. Henson He didn't get fired for turning them in. What did he get fired for? Go ahead and answer my question. I would argue my client was let go because he blew the whistle. That's exactly what happened. He got fired for turning them in. That's your position. Exactly. Let's see what the other side says about this. And you have some time reserved. Ms. Webb. Good morning, Your Honors. My name is Ann Webb, representing the Secretary of Labor. Good to have you here. Thank you. I would like to address three main points today. First, the ARB consistently applied its precedent in this case, and substantial evidence supports the ARB's conclusion that interveners proved, by clear and convincing evidence, that they would have terminated Mr. Smith if they had learned through other means that the fire watch log was falsified and that Mr. Smith delayed for seven days. He didn't falsify the fire watch log. That's correct, Your Honor. And he told them to fix it, and they told him the inspection occurred and that they were going to fix it. What happened on February 12th, Your Honor, is that Mr. Smith confronted Mr. Pence after noticing that Ms. Borders had signed for a fire watch round and then left the facility. And Mr. Pence said that he was going to conduct Ms. Borders' fire watch round for her. Now, Mr. Zuckerman says it's sufficient that he reported it to a co-worker. Do you agree? Your Honor, I would emphasize that Mr. Smith's argument is asking, through Mr. Smith's argument, he's asking this court to re-weigh conflicting evidence. You haven't answered Judge Keenan's question, I don't think. Was he responsible for reporting it to a supervisor or is reporting it to a co-worker sufficient? The evidence credited by the ARB was that the same plant manager also testified that he expected. You still haven't answered her question. I'm almost there. You're almost there. Mr. O'Brien also testified that he would have expected Mr. Smith to report the falsified fire watch log to a supervisor that day on February 12th. There were regulations in effect that mandated reporting to a supervisor. Is that what you're saying? The safety manual required immediately reporting safety issues to a supervisor. The safety manual? Yes, the DZA safety manual required that. And furthermore, Mr. Horde, who worked for Duke, had, just a month before this occurred, made sure to inform the fire watchers that it was very important that the fire watch logs be accurate because another plant had recently been subject to enforcement by the Nuclear Regulatory Commission. Another plant owned by Duke? Frankly, I'm not sure who owns the other plant, but it was another nuclear plant. Another nuclear plant somewhere in the country? Yes, regulated. This one's down in North Carolina? I believe it's in South Carolina. South Carolina? Yes. Oh, the Catawba plant? Yes. Therefore, what Mr. Smith is asking this court to do, essentially fundamentally here, is to re-weigh conflicting evidence, which, in a substantial evidence review, this court has said that it will not do. Well, he understood. They say that he understood that the logs weren't turned in until the end of the month and that he was taking into account that proposition and that they would get it corrected by the end of the month. And this, all this occurred mid-month. Was it correct that the logs weren't turned in until the end of the month? I believe so, Your Honor. But what the ALJ found was that... So at the time he told them to the supervisor, on the 19th or the 21st or whatever it was, the logs still hadn't been turned in. They had time to fix it. That's right, Your Honor. However, the falsification that we're dealing with here was very significant. Well, I agree with that. I mean, nobody's contested it. I don't think you can say that he falsified the fireball spokes. But that wasn't him that did it. That was a porter that did it and Pence that went along with it. And this fellow turned them in. Then he got fired along with them. Now, when you look at it in that context, it's kind of smell. What happened here, Your Honor, is that Mr. Pence, excuse me, Mr. Smith, immediately recognized the severity of the fire watch log falsification. And he did confront Mr. Pence about that falsification. What the ALJ found is that then Mr. Smith signed directly underneath that same falsified fire watch log. And the physical evidence demonstrates this. He signed for his own inspection? He signed for his own inspections. Well, that's what he was required to do. He was only required to sign for his own inspection. Yes, but he must have seen that Mr. Pence had not corrected the falsified round, as Mr. Pence had said he would. But Pence told him he was going to fix it, that I either did the inspection or I'm going to do the inspection and I'll fix it. What's important here is that Mr. Pence did not correct the record. And Ms. Borders left the facility without conducting the round for which she had signed. But you don't have anything that he falsified? No, Mr. Smith did not falsify a record. Do you have anything that he lied about? What Mr. Smith did is he… Do you have anything he lied about? Mr. Smith does not appear to have lied in this case. He doesn't appear to have lied that he didn't falsify the book? He did not himself falsify the book. What he did do is he knew about a falsified record. He knew about it. On February 12th. And he knew about it and he said that he did what he thought he had to do, which was tell the co-worker and get it fixed. Well, the evidence on that is conflicting. He can't falsify books, fix it. The evidence on the record is conflicting. The supervisor, the same supervisor also testified in the ARB, found that Mr. Smith should have told a supervisor on the 12th about the falsified record. But you're not supposed to retaliate against whistleblowers. That's what this case is about. Whistleblowers are supposed to be encouraged to come and report. That's correct, Your Honor. Wrongdoing. Yes. And they shouldn't have to fear that if they report that they're going to get fired too or retaliated against for reporting. That's correct, Your Honor. That's what this whole thing is about is I understand it. If I'm misunderstanding it, you explain it to me. Not at all, Your Honor. Affirming this case, excuse me, affirming the ARB's decision in this case will not undermine whistleblower protections for employees who work in nuclear plants or who are subject to the Energy Reorganization Act. Well, we'd be saying that you can fire somebody for reporting. Maybe you reported the wrong person. In this case, the fundamental question is whether interveners would have terminated Smith for the lengthy delay in reporting a safety-related issue if he had not engaged in protected activity. And the board found that they proved by clear and convincing evidence that they would have held him responsible. You're talking about the interveners. You're talking about Duke Energy and Atlantic Group. They're the interveners? Yes. You use all these technical terms. I don't understand them. They're the people that ran the plant. Yes. Duke is the licensee. And DBA is the contractor. And they ought to be safe. Everybody understands that. Yes, exactly. And affirming the ARB's decision here. And the books shouldn't be falsified. That is correct. Inspections should occur. And whistleblowers should be protected. I agree with all those statements, Your Honor. I do, too. You and I are on the same page. The reason that affirming this case will not undermine whistleblower protections is that this case differs significantly, factually, from the other late reporting cases that we have seen and that Mr. Smith has raised in the briefs. This case involves an employee who immediately recognized a safety-related issue, which is evident here because Mr. Smith confronted Mr. Pence right away. And it does not mean that the book had been falsified. Yes. Okay. And Mr. Smith also did not need time to, as we see in other cases, especially injury reporting cases, for example, where employees need to consult a medical professional or who need to go to a lawyer to figure out whether what they've witnessed is, in fact, a violation, or who have symptoms that they need time to develop to identify whether they are connected to an incident at the workplace. This case has none of those facts. This case is very clear-cut. Mr. Smith was aware of an important safety-related issue. He failed to report it to his supervisor, and when he did his supervisors concluded that he did not fundamentally intend to, did not appear to have intended to really make the report to supervisors. He didn't intend to what? His explanation for why he had not promptly reported the safety issue to his supervisor was not satisfactory to his managers. So he was fired for not reporting it to the supervisor. Yes. Okay. So he wasn't, okay. It's also important to note. Had he been trained that he had to report? You say that was in some manual. Yes, Your Honor. Had he been trained on that manual? Yes, he had been trained on that manual, and he had been trained to accurately fill out this particular form. And that's really, no question about that, he knew that the book had to be filled out right? Yes. And he saw what was filled out wrong? Yes. And he told Pence this was wrong? Yes. And Pence says, I will do the inspection and I'll fill it out right? Correct. But then that, so he was fired for doing it that way rather than doing it the way you said he should have done it. So maybe he was fired in for disrespect of bad judgment. Yes, Your Honor. What the ALJ found and what the ARB affirmed was that the employers concluded that Mr. Smith lacked the requisite trustworthiness and reliability. Employers are Duke? Duke and DZA. He didn't work for Duke though, he worked for Atlantic. The contractor is Atlantic, that's who his payroll went through. That's who he worked for. He was supervised by Duke on a daily basis. Did Duke fire him or did Atlantic fire him? Duke released his employment and then DZA terminated his employment with DZA. That's right. Okay, when he was asked the reason why he hadn't reported it sooner, what was his reason? He said he just hadn't thought about it, isn't that correct? He said he just hadn't thought about it and then sort of subsequently in that conversation he said that he might have, it was starting to bother him and maybe he would have reported it by the end of the month. Okay, did he ever say in his explanation at any time that he thought reporting it to Pence was enough? That is not in the record. What's significant here is that And when he reported it to the interveners, was seven days or nine days after it happened? Seven days, Your Honor. Seven days. Yes, and I just want to address Before the end of the month, well before the end of the month. Yes, Your Honor. I just want to address a couple of factual issues that Smith raised that are not supported by the record here. First, regarding Simmons and Wray, who Smith argues should be comparators. Mr. Smith was interviewed by Simmons and Wray about the false harassment allegations on February 19th. And the ALJ weighed a significant amount of conflicting testimony about what occurred in that meeting. And the ALJ concluded that Mr. Smith did not specifically reference the fire watch logs in that conversation. That Ms. Simmons' contemporaneous notes and other evidence in the record indicates that Simmons and Wray were not aware when they asked Mr. Smith to allow them time to investigate of anything other than potentially falsified timesheets. And DZA wanted some time to investigate that internal issue. So, this is another instance in which Mr. Smith is basing his argument on Excuse me, my time is up. Go ahead and finish your answer. Mr. Smith is basing his argument on facts that have been fully decided by the ALJ and the board and is requesting sort of more than a substantial evidence. I've got one more question for you. On this Spiegel case, or whatever it's called. Yes, Your Honor. Do you acknowledge that was misapplied in this decision? No, Your Honor. At your own precedent, do you acknowledge that was misapplied by the board? No, Your Honor. The board properly applied Spiegel in this case. All right. Thank you, Your Honor. Thank you. Mr. Mehta. Good to have you here, sir. Thank you, sir. Always a pleasure to be up here. The petitioner argues in this case that he was fired for telling the truth. Or, as Your Honor, Judge King indicated, fired for blowing the whistle. But this is just not. That's what he's claiming. I mean, it's a whistleblower retaliation case. That's what he's claiming. I understand it. Yeah. But that's just not so. When you look at the actual findings of the actual judge who was charged with making the determination in this case, what the actual findings are is that he was fired for deliberately withholding and concealing the truth. And, I mean, all you have to do is go to the judge's findings. You're talking about the ALJ? ALJ. The ALJ didn't have the benefit of this Spiegel case. Well, this is actually he did not when he made these findings, but these are factual findings. These are not application of findings of fact to the law. What the ARB said on that point, Your Honor, is that it didn't matter because the case that he did apply, the Carr case, is essentially the same as the Spiegel case. So it didn't matter from a legal standpoint, is what the ARB said. And if you look on page 570 of the joint appendix, he says, in summary, while Mr. Smith's work is good and all of that stuff, Mr. Smith's deliberate withholding of his knowledge of Ms. Borders' falsification for several days, as well as his disclosure of the falsification only after being confronted with an allegation of sexual harassment, based on those factors, he finds that the evidentiary record provides exceptionally strong evidence to support Mr. O'Brien, that's Duke, determination to release Mr. Smith. And the same evidence supports Mr. Henline, that's D.C. Atlantic's determination to fire him. Those are the factual findings of the fact finder charged with making the factual findings. And everybody agrees in this case that the appropriate standard of review is that the ALJ's factual finding determinations may not be second guessed, certainly not by the ARB and certainly not by this court, and must be accepted if they are supported by substantial evidence. And as you just heard from Ms. Webb, and if you take a look at the actual findings, even underlying what the ALJ said on his remand decision, go back to his original decision, which goes on for about 100 pages, you will find ample evidence to support those findings. And that's what this case, where this case, you know, should end. And under those circumstances, when you have factual findings that say this man was not trustworthy, and the claimant comes in and so the petitioner comes in and said, well, this is wrong, now he was trustworthy. All of those facts, all of those issues were before the ALJ, and that's what he found. And under those circumstances. Trustworthiness, I guess, assumes that he had an obligation to do something more than tell Pence to fix the log. And I guess we clarified that he did have that obligation. I think he did have that obligation. And think about it in this term, Judge Diaz. The Spiegel case, essentially the Spiegel case says this is a factual determination, which the burden of proof is on the employer, not the claimant, by clear and convincing evidence. And what the Spiegel case at its bottom says is you've got to take a look at the facts and decide, fact finder, you decide whether those facts equate to the appropriate level of proof, clear and convincing evidence. So if you, again, bring it back to this case, and the petitioner keeps trying to talk about cases in the abstract, it's this case that we're dealing with here. In this case, the facts as found equate to untrustworthiness. Why? Because it is totally clear that Mr. Smith knew exactly the first moment he saw the entry that this was wrong, because the entry was made by Ms. Borders for a time when Ms. Borders wasn't in the building. And he confronted his coworker about that, and the coworker said, I'll fix it. And then Mr. Smith goes on and does his rounds, signs immediately underneath a non-fixed entry. So he could see that it wasn't fixed. It hadn't been fixed by then. It had not been fixed by then. And he could see it the next entry, the time he did his rounds and signed, and he could see it the next time he did his rounds and signed, and he could see it the next time he did his rounds and signed, and he could see it the next day when he did his rounds and signed, and on and on and on. Was it just one big long page? Did they turn the page? After they turned the page, he couldn't see it anymore unless he looked back. Well, he could look back. Yeah. They did it every hour? They did it every hour. So how many lines were on a page? That I do not know. Well, if it were 24, there was a page for each day. There was probably a page for each day. But even though, even then, I mean, he knew it was wrong. He never fixed it, or he never saw to it that it got fixed, until he got accused of sexual harassment. He reported it. When he got accused of sexual harassment. And he reported it. And he reported it. But the sexual harassment claim was never determined to be. . . That is totally true. Never determined to be found. I think it was determined that it may have been trumped up. Determined to be trumped up. But for this purpose, where we are is he tells Duke after he is. . . Seven days later. Seven days later, after he is accused of sexual harassment. And so you fired everybody. And so everybody got fired. You fired all three of them. D.Z. got fired. The last question is whether you're entitled to fire the one that reports. If he hadn't reported, would you have fired anybody? No. Well, no, because nobody would have ever figured it out. You wouldn't have fired anybody. Unless they figured it out later in some other way. And what. . . He's your witness. I mean, you fire the witness. I used to be a prosecutor. We used to turn people around and make them witnesses all the time. And we'd give them leniency. Or turn them loose. All the time to testify against people who may have been worse. Or hopefully they're worse. Sometimes you're dealt the other way. But you made decisions all the time to let somebody off easy. Or let somebody off differently. Because they told on the others. You made them whistleblowers. But again. . . You made them snitches. They called them snitches in the jailhouse. But you have to come back to what the statutory. . . That's what you've got to hear. I mean, the question is whether in these labor proceedings the board can approve firing a whistleblower who turned in a violation at the nuclear plant along with the two people that did the falsification. Yes. And maybe you can. I mean, maybe that. . . Yes, you can. But, you know, there's parts of it that doesn't look too good for anybody. Yes, you can. Because Congress says you can. But Congress says you can only do that. Only. If the employer proves by clear and convincing evidence that the employer would have taken the same action had the whistleblower not blown the whistle. Right. That is the law. That is the law. Judge Royce said it was all wrong. She dissented. Well, yeah. But the other two said it was right. There was a split board on this thing. Well, there was a split board. And I think if you read one thing that probably hasn't gotten as much play in the briefing as it may have should have is the concurring judge on the. . . Yeah, we agree on that. You're red lights on, too. Well, we've been pretty lenient here. I guess that's the standard this morning. They take advantage of me. They think I'm easy. Well, just take a look at what he said. He said, and this is at 649 of the record, it is undisputed that Smith failed to disclose the fact of inaccurate certification of fire watch logs. This means that the employer. . . For seven days. Clear. . . You could write in there seven days. For seven days. Yeah. This means that the employer. . . By the end of the month. You can write that in there, too. had clear and undisputed reasons, among other reasons, to question Smith's integrity. That's what they did. That's why they fired him, because of lack of integrity. Thank you very much, sir. Thank you, Your Honor. Mr. Zuckerman, you saved some time. Your Honor, I didn't get into Spiegel, which I really. . . You don't necessarily agree with all that. Didn't do. Yes, and I hate to spend a lot of time on this one issue, but Joint Appendix, page 28. Mr. Henlein, under oath at the trial, you agree, Mr. Henlein, that if Mr. Smith told Mr. Pence that, hey, Chris Borders has falsely stated in the log that she performed a fire watch that Mr. Pence, in fact, performed, and then Mr. Pence agreed to correct the log, that Smith did not need to report that inaccuracy. Correct. Answered by Mr. Henlein. Mr. Henlein was a boss man? Yes, he was a DC Atlantic manager. I believe I did say that, yes. Joint Appendix, page 58. Mr. O'Brien also says there's no obligation for Mr. Smith to go any higher once you go to the co-worker. The key thing is here that the inspection got performed. Mr. Smith made sure of that immediately. At that point, there was an inaccuracy in the log. Mr. Smith's only obligation. How do you get around the finding of the ALJ that Mr. Matta just read to us? How do you get around that, and how is that clearly erroneous? Is that contrary, is that clearly erroneous because of what Mr. Henlein said? Yes, and what's the specific holding by the ALJ, that my client is not an honest person? We've got a record here of my client being a high-performing and reliable individual, and DC Atlantic has acknowledged they had a progressive disciplinary policy. The appropriate thing to do maybe here would be to write up my client or to suspend my client, but to remove my client. What does that say to all of the employees at the plant? Close your mouth because if you blow the whistle, you're out, even when you have a perfect performance record, and no matter how unimportant the issue is that you delay the reporting. This ruling here by the board is going to stifle whistleblowing at nuclear power plants? Absolutely, Your Honor, and what it does is it invites employers to do what they did here, to say, why did this employee blow the whistle? We don't care about the employee's concerns, and by the way, had they looked at my client's concerns, they would have seen there were a host of problems with that inspection program. My client ultimately went to the NRC after he was let go, and the NRC looked into it, and they saw these problems, but if not for my client blowing the whistle to the employer and then the NRC, no one would have known about these problems. This is an individual you want at a plant, a person who's proactive, who would blow the whistle. If this is a firm, all employers have to do is say, he blew the whistle. Let's look for any way to get rid of that employee. Now, I would like to get into Spiegel in my last two minutes very quickly. Spiegel hold, the only way to meet that elevated burden is if you can show, as the employer, that you took the same action for the same violation. This is critical. Neither intervener could provide a single example where they removed an employee or took any action because of any delay at all in an employee making a report. If they can't offer any other example, they can't meet that elevated burden. And that's the end of this case. My client wins. They didn't have that evidence. The only thing that was offered by the NRC. Why wouldn't they get a do-over? Why wouldn't they just have to undertake to comply with Spiegel? If the ARB applies Spiegel to this evidence, they can't meet that burden. Yeah, but you say they haven't yet. So why wouldn't the remedy be, if you're right, why wouldn't the remedy be that we remand it and tell them to do it right? Yes, Your Honor. I would agree with that completely. We wouldn't reverse. You keep saying reverse. Sorry. We'd basically remand. Remand, sorry. Sorry, Your Honor. If they apply Spiegel, and it was applied properly by Judge Royce, excuse me, they can't meet that burden. And I would ask, Your Honor, to look at the BNSF case. Well, they might be able to meet the burden. They might just have to explain it better. That goes actually to my next point, which is I would ask that the court look at the BNSF case. That's a holding in the Tenth Circuit that I provided to the court about a week ago where the court there applied Spiegel, and it's almost exactly like this case. They get rid of the employee because of his delay in reporting an injury. And Spiegel is their own decision. All you're saying is they ought to apply their own rule. Yes, and when it was applied in the BNSF case, which is a lot like this case, the court holds they can't meet that burden if they don't have an example of a prior action by that employer because of a delay. Well, are you saying then that the employer has to show that it would have found the information irrespective of the whistleblowing act? No, but, Your Honor, they have to show that they would have acted that way had they learned of it independently, and as was held in the BNSF case, and it should be held here, interveners have never been able to show that they took any action against an employee because of any delay in a report. What if the situation hadn't arisen before? In other words, you know, it seems to me that maybe you're raising the standard beyond what is really there. Sorry, Your Honor. Spiegel holds the employer has to have an example, number one. Number two, it happened here. There were two individuals who interviewed Mr. Smith about this harassment allegation. He blew the whistle at that point. They never made any report, and they still have their jobs. So if the employer is not applying that rule in an even-handed manner, i.e., if you are aware that there's inaccurate information in any document at a plant and there's any delay whatsoever, you're out. They didn't apply it here to their own employees. So why should they apply it to my client? Instead, what they did is without even interviewing my client, they said he's not an honest person, no evidence whatsoever that he ever provided any inaccurate information. They said, you're out. Thank you, Your Honor. Thank you very much.
judges: Robert B. King, Barbara Milano Keenan, Albert Diaz